UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO:  12-001 |
| v. | * | SECTION: "F" |
| TELLY HANKTON | * | |

\* \* \*

**GOVERNMENT'S MEMORANDUM IN
OPPOSITION TO DEFENDANT, TELLY HANKTON'S MOTION FOR PRE-
AUTHORIZATION DISCOVERY (REC. DOC. 286)**

**NOW INTO COURT** through the undersigned Assistant United States Attorneys comes the United States of America in opposition to the Defendant's Motion and Memorandum in Support for Pre-Authorization Discovery (Rec. Docs. 286 and 286-1) as follows:

**FACTS AND PROCEDURAL HISTORY**

On October 18, 2012, Telly Hankton and twelve codefendants were indicted in a twenty-two count superseding indictment, which included death penalty eligible charges against Telly Hankton and four codefendants. (Rec. Doc. 73).  Under the terms of a scheduling order agreed to by all parties and issued by United States District Judge Martin L.C. Feldman, the five defendants eligible for the death penalty have until September 13, 2013, to submit mitigation information to the United States Attorney's Office.  (Rec. Docs. 227 and 284).

Hankton has requested certain information and documentation be produced by the Government to him in this early pre-authorization stage, arguing that it is necessary for his development of mitigation information he intends to submit to the United States Attorney's Office and the Department of Justice.  Prior to filing his motion, Hankton, under cover letter dated May 28, 2013, requested certain items be produced "as a matter of pre-authorization

discovery." (*See* Exhibit A to Defendant's Memorandum).  In his letter, Hankton requested the production of items or information related to ten subject areas:  five items related to the murder of Jesse Reed, charged in Counts Eight and Nine of the Superseding Indictment, and five items related to the murder of Darnell Stewart, charged in Counts Five and Six of the Superseding Indictment.  The Government responded to Hankton's request under cover letter dated June 17, 2013. (*See* Exhibit B to Defendant's Memorandum).[1]  Through that response and the attachments thereto, the Government provided additional information and documentation, but, as discussed more fully below, specifically resisted 1) disclosing identities of witnesses, including their names and addresses, of individuals the Government feared would be harmed by such disclosure at this stage in the proceeding, and 2) producing privileged documents and items not subject to disclosure pursuant to "Federal Rule of Criminal Procedure 16(a)(2) and Federal Rule of Evidence 502."

After considering the Government's letter response, through his motion and memorandum in support of the motion for pre-authorization discovery, Hankton refined his requests for the production of documents and information.  With regard to the items sought related to the Jesse Reed murder, Hankton now seeks only the first two items related to the Jesse Reed murder, specifically, 1) the identity and whereabouts of all witnesses who misidentified Edward Allen as a perpetrator in the Reed homicide; and 2) production of all statements made by any witnesses who misidentified Edward Allen as a perpetrator in the Reed homicide.  The Government submits, consistent with its representations in its June 17, 2013 letter, that any statements in its possession relating to misidentifications of Edward Allen and identifications of

---

[1] This response is in addition to three batches of discovery that consisted of thousands of pages of reports and other documentation as well as compact disks containing audio recordings and other discovery items.  Hankton acknowledged on page 2 of his memorandum that "the Government has provided three waves of voluminous discovery."  The Government submits that these productions have included *Brady* materials and go well beyond the requirements of Rule 16 of the Federal Rules of Criminal Procedure.

2

Telly Hankton have been disclosed (in redacted form) through the discovery process.[2]  These statements can be found in the discovery made available to defendant on June 7, 2013, and include a state deposition transcript at bates-stamped pages 12,437-12,446, a state grand jury transcript at bates-stamped pages 12,502-12,509, and a New Orleans Police Department recorded statement at bates-stamped pages 12,510-12,517.  With regard to the Darnell Stewart murder, Hankton continues to seek production of the items he detailed in numbers 6-10 from his May 28, 2013 letter.

## LAW AND ARGUMENT

As mentioned by Hankton in his memorandum and as contemplated by the District Court's Scheduling Order, the Government and the death eligible defendants are presently preparing submissions to the United States Attorney for this district and ultimately the United States Attorney General to consider when deciding whether the death penalty should be sought against each defendant.  Trial is presently scheduled for February 3, 2014.

At this pre-trial stage, Hankton seeks to require the Government to disclose 1) witness names and locations related to a misidentification of Edward Allen, as well as 2) internal government documentation and communications involving the United States Attorney's Office related to its decision to prosecute the Darnell Stewart homicide charged in Counts Five and Six of the Superseding Indictment.  In support of his requests, Hankton cites Supreme Court cases that support the general proposition that in death penalty cases a greater degree of attention and diligence is required in certain stages of the criminal proceedings given the penalty involved.[3]  Hankton also cites several district court opinions in support of his requests.  While these cases

---

[2] Consequently, the Government submits there is nothing further to produce with regard to Hankton's second request as to the Reed murder.
[3] *See* cases cited by Hankton: *California v. Ramos,* 463 U.S. 992 (1983); *Turner v. Murray*, 476 U.S. 28 (1986); *Ford v. Wainwright*, 477 U.S. 399 (1986).

recognize the need for a defendant to receive discovery in order to effectively prepare for trial or a presentation to the United States Attorney's Office or the Attorney General regarding the death penalty, none of the cases required the disclosure of witness identity and location information or privileged governmental communications and documentation for purposes of assisting a defendant to prepare his mitigation submission regarding the death penalty.  Further, Hankton ignores statutes and case law that specifically address this issue and hold that the Government does not need to disclose witness identity information far in advance of trial or to turnover privileged governmental work product.

**<u>Department of Justice Death Penalty Policy and Procedures</u>**

Under Section 9-10.000 of the United States Attorneys' Manual (the so-called "death penalty protocol") that "sets forth policy and procedures to be followed [within the Department of Justice] in all federal cases" that are potentially capital in nature, federal prosecutors must obtain the personal authorization of the Attorney General before seeking the death penalty. As part of that authorization process, the United States Attorney "should" provide defense counsel with a "reasonable opportunity" to present any information that would militate against seeking the death penalty and to prepare a recommendation for the Attorney General as to whether or not the death penalty should be sought with respect to a defendant charged with an offense that is subject to the death penalty. The death penalty protocol further directs that the United States Attorney's recommendation "shall be reviewed" by an intra-departmental capital review committee appointed by the Attorney General, and that defense counsel "shall be provided the opportunity" to present to the review committee any reasons why the death penalty should not be sought. The capital review committee is required to submit a recommendation to the Attorney General, who, in turn, is required to conduct an independent review and decide whether the

government should seek the death penalty. Finally, the death penalty protocol provides "standards of determination" (i.e., that the evidence is sufficient to establish justification for a death sentence at trial and to support on appeal a jury's decision to impose a sentence of death) that the appropriate Departmental officials are required to utilize at each stage of the recommendation, review, and authorization process to assess whether the death penalty should be sought.

**The USAM Does Not Provide Substantive Rights to Hankton**

The United States Attorneys' Manual provides a protocol by which Assistant United States Attorneys are expected to follow in death penalty cases. It is long established, however, that this protocol does not provide defendants with any substantive rights, despite Hankton's attempts to suggest otherwise.

"[T]he internal guidelines of a federal agency, that are not mandated by statute or by the [C]onstitution, do not confer substantive rights on any party." *United States v. Craveiro*, 907 F.2d 260, 264 (1st Cir.), cert. denied, 498 U.S. 1015 (1990). *See also*, *United States v. Caceres*, 440 U.S. 741, 749-756 (1979) (violation of agency regulation that was neither constitutionally nor statutorily required restricting the use of investigative techniques did not require the exclusion of evidence in a criminal prosecution). The instant capital authorization procedures contained in the protocol are neither constitutionally nor statutorily mandated. In *Gregg v. Georgia*, 428 U.S. 153, 199 (1976), the Supreme Court rejected a claim that the Eighth Amendment was violated because prosecutors possessed unfettered discretion to determine which death-eligible defendants would be capitally prosecuted and which death-eligible defendants would be prosecuted on non-capital charges. See also, *McCleskey v. Kemp*, 481 U.S. 279, 296-297, 306-308 (1987). Nor does the applicable federal capital sentencing statute, 18

U.S.C. 3591, et seq., intrude on traditional concepts of prosecutorial discretion. The federal statutory scheme speaks entirely to the judicial process by which it is determined whether or not a particular death-eligible defendant should be sentenced to death. Although the judicial process described in the statute is triggered by the filing of a notice of an intent to seek the death penalty by an "attorney for the government" with respect to a charged capital offense (see 18 U.S.C. 3593(a)), nothing in the statute prescribes any procedures or places any restraints as to how the "attorney for the government" is to exercise discretion in determining whether capital charges should be filed or the death penalty sought. Thus, the internal review provisions of the death penalty protocol are not required by the trial procedures of the Federal Death Penalty Act of 1994.

Moreover, like the provisions of the IRS manual that were at issue in *United States v. Lockyer*, 448 F.2d 417, 421 (10th Cir.1971), "[t]he entire design and thrust" of the death penalty protocol "is that of internal administration." See also, *Sullivan v. United States*, 348 U.S. 170, 173 (1954) (DOJ directive establishing an internal authorization process for criminal tax prosecutions, that "was never promulgated as a regulation of the Department and published in the Federal Register . . . was simply a housekeeping provision of the Department"); *United States v. Thompson*, 579 F.2d 1184, 1188-1189 (10th Cir.) ( en banc), cert. denied, 439 U.S. 896 (1978) (characterizing USAM provision as "a 'housekeeping provision of the Department . . . that is at most a guide for the use of the Attorney General and the United States Attorneys in the field"). The death penalty protocol was not formally promulgated and "does not purport to exist for the interest" of potential capital defendants. Cf. *Lockyer*, 448 F.2d at 421. To the contrary, policies issued by the Attorney General to direct the litigation that the Department conducts and to regulate the activities of the attorneys that the Attorney General controls expressly disavow any

purpose confer rights that are enforceable by private parties against the government. See *United States v. Lorenzo*, 995 F.2d at 1448, 1453 (9th Cir.), cert. denied, 114 S. Ct. 225 (1993); *In re Shain*, 978 F.2d 850, 854 (4th Cir. 1992).

Section 1-1.100 of the USAM makes clear that its provisions, which include the death penalty protocol under which the Attorney General decides whether prosecutors should be authorized to seek the death penalty, constitute "only internal Department of Justice guidance." The USAM's provisions are "not intended to, do[] not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations placed [by the USAM] on otherwise lawful litigative prerogatives of the Department of Justice." Id.[4]

---

[4] Against this background, the Supreme Court and the circuit courts of appeals have consistently held that regulatory provisions contained in the USAM and in similar manuals do not create substantive rights and may not be enforced against the Government contrary to its wishes. See, e.g., *United States v. Caceres*, 440 U.S. 749-756 (regulations in IRS manual restricting use of consensual electronic surveillance); *Rinaldi v. United States*, 434 U.S. 22, 29, 31 (1977) (DOJ policy regulating successive prosecutions enforceable only when "its application is urged by the Government"); *Sullivan v. United States*, 348 U.S. at 173-174 (DOJ directive prohibiting submission of criminal tax cases to the grand jury without approval of the Attorney General); *United States v. Piervinanzi*, 23 F.3d 670, 682-683 (2d Cir.), cert. denied, 115 S.Ct. 259 (1994) (DOJ guidelines for prosecutions under money laundering statute); *United States v. Lorenzo*, 995 F.2d at 1453 (DOJ guidelines regarding recusal of government attorneys); *In re Shain*, 978 F.2d at 853-854 (DOJ guidelines regarding subpoenas of reporters); *United States v. Michaud*, 860 F.2d 495, 499 (1st Cir. 1988) (IRS guidelines on referral of fraud cases for prosecution); United States v. Gourley, 835 F.2d 249, 251 (10th Cir. 1987) (collecting cases) (DOJ guidelines regarding successive prosecutions), cert. denied, 486 U.S. 1010 (1988); *Matter of Klein*, 776 F.2d 628, 634-635 (7th Cir. 1985) (DOJ guidelines regarding subpoenas of attorneys); *United States v. Hinton*, 719 F.2d 711, 719 n. 9 (4th Cir. 1983) (DOJ guidelines regarding preservation of agents' rough notes of interviews), cert. denied, 465 U.S. 1032 (1984); *United States v. Kaatz*, 705 F.2d 1237, 1243 (10th Cir.1983) (IRS guidelines on referral of fraud cases for prosecution); *United States v. Ivic*, 700 F.2d 51, 64 (2d Cir. 1983) (DOJ guidelines for RICO prosecutions); *United States v. Myers*, 692 F.2d 823, 845-846 (2d Cir. 1982), cert. denied, 461 U.S. 961 (1983) (DOJ guidelines regarding undercover investigations); *United States v. Thompson*, 579 F.2d at 1188-1189 (DOJ guidelines regarding successive prosecutions); *United States v. Lockyer*, 448 F.2d at 420-421 (IRS regulations regarding referral of tax fraud cases).

Thus, there are no substantive rights created by the policy and procedures outlined in the USAM, which would require the Government to divulge witness' identities and addresses to the defendant for purposes of mitigation or to reveal privileged governmental materials and communications.

**<u>Witness Identity and Location Concerns</u>**

Not only does the USAM not create substantive rights under which Hankton can attempt to avail himself in support of his demands, but statutes and case law specifically addressing witness safety concerns and privileged governmental materials and communications support the Government's position not to turn over the requested materials.

In determining the extent of discovery in criminal cases, there must be a "balancing of the public interest in protecting the flow of information against the individual's right to prepare his defense," which depends on "the particular circumstances of each case." *U.S. v. El-Mezain*, 664 F.3d 467, 491 (5th Cir. 2011) (quoting *Roviaro v. U.S.*, 353 U.S. 53, 62 (1957)). In performing such balancing, where there is a serious and clear need to protect witness identities because of concerns for their safety, concealing the identity of witnesses is appropriate. *Id.* at 492 (ruling that the use of pseudonyms was appropriate to protect against potential threats to witnesses). The Fifth Circuit has held that the trial court may limit a defendant's access to witnesses to prevent harassment or other wrongdoing. *U.S. v. Soape*, 169 F.3d 257, 270 (5th Cir. 1999). The Fifth Circuit has also recognized that, as per rule 16, access to witness information at and before trial can be limited for safety concerns. *See U.S. v. Alston*, 460 F.2d 48 (5th Cir. 1972) (recognizing that witness address and name could be withheld during trial); *see also U.S. v. Heard*, 709 F.3d 413 (5th Cir. 2013) (citing the Supreme Court in *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) in saying that the "District Court has wide latitude insofar as the Confrontation Clause is

concerned to impose reasonable limits on…cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety…"); s*ee also U.S. v. Deane*, 8 F.3d 21 (5th Cir. 1993) (holding that submitting evidence under seal to protect witness identity before trial was proper when defendant had threatened government witnesses). The Fifth Circuit has also specifically recognized the dangers that court proceedings pose to witnesses who are in jail because they may be identified as "snitches" and be killed or injured. *Gullatte v. Potts*, 654 F.2d 1007, 1012-13 (5th Cir. 1981).

Similar to the Fifth Circuit's holdings on witness safety, the Seventh Circuit has held that witness identity can be limited in the face of dangerous defendants. *U.S. v. Napue*, 834 F.2d 1311, 1317 (7th Cir. 1987). Similarly, in *U.S. v. Fort*, the Ninth Circuit specifically held that the government could redact witness identities in local police reports where the redactions were consistent and supported by an articulated intention to protect witness identities in the context of a case in which the district court had already found a serious risk of harm to witnesses. *U.S. v. Fort,* 472 F.3d 1106, 1120 (9th Cir. 2007). Additionally, of course, any potential witness can refuse to talk to defense counsel prior to trial if he chooses as long as there is no interference by law enforcement or the prosecution. *U.S. v. Skilling*, 554 F.3d 529, 567 (5th Cir. 2009) (overturned on other grounds); *See also Johnson v. Puckett*, 176 F.3d 809, 816 (5th Cir. 1999). It is also worth noting on general grounds that the Supreme Court has declared "there is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).

In *U.S. v. Henderson*, 461 F.Supp.2d (S.D.NY 2006), the court cited Title 18, United States Code, Section 3432[5] in support of its decision denying a defense request to require the

---

[5] In relevant part, Title 18, United States Code, Section 3432 states: "a person charged with treason or other capital offense shall at least three entire days before commencement of trial be furnished with a copy … of the witnesses to

9

government to produce the addresses of certain prosecution witnesses with trial less than one week away.  Similarly, in *U.S. v. Booth*, 2010 WL 4181186 (D.Nev.), the district court vacated a magistrate judge's order requiring the disclosure of information that would have revealed the identity of witnesses and consequently endangered their safety.  In explaining its decision, the district court noted the impracticality of providing "24-hour protection for witnesses against an allegedly violent, criminal gang for such a long period before trial." *Id*. at p. 4.

      As detailed in the Superseding Indictment, this investigation has revealed and the grand jury has charged Telly Hankton and the Hankton Organization with the murders of Hasan Williams and Curtis Matthews and the attempted murder of J.M., each a witness or family member of a witness to a murder Telly Hankton committed.  As described in paragraph 83 of Count One and as charged in Counts One, Ten and Eleven of the Superseding Indictment, Hasan Williams was murdered two weeks after witnessing the murder of Jesse Reed and after coming forward as a witness.  As described in paragraph 89 of Count One and as charged in Counts One, Thirteen and Fourteen of the Superseding Indictment, J.M., a witness to the murder of Darnell Stewart, was shot numerous times while Hankton was pending trial for the murder of Darnell Stewart in state court.  As described in paragraphs 91-92, and 95 of Count One and as charged in Counts One, Seventeen and Eighteen, Thomas Hankton, Netthany Schexnayder, and Sana Johnson conspired to obstruct the trial of Hankton in state court for the murder of Darnell Stewart by assisting in the presentation of perjured testimony with regard to a false alibi for Hankton.  Finally, shortly after Hankton was found guilty and sentenced to life imprisonment in state court, Curtis Matthews, the brother of J.M. was murdered.  *See* paragraph 97 of Count One and Counts Fifteen and Sixteen charging the murder of Curtis Matthews.  Thus, this is not a

---

be produced on the trial for proving the indictment, stating the place of abode of each …witness, except that such list of …witnesses need not be furnished if the court finds by a preponderance of evidence that providing the list may jeopardize the life and safety of any person."

hypothetical situation when the Government might have concerns that witnesses' safety may be in jeopardy, but in fact, witness safety (and harm) serves as a key component of the Superseding Indictment and its incorporated charges.

Importantly, it should be noted that the District Court, on its own accord, issued an order for an anonymous jury holding that the "totality of the circumstances demands anonymity in this case." Rec. Doc. 207, p. 13. United States District Judge Feldman stated that the "indictment alleges charges of the most serious, wicked, and alarming nature; the murder of four individuals, assault with a deadly weapon, possession and distribution of a significant quantity of various drugs. . . a variety of weapon offenses. . . money laundering, lying under oath, and obstruction of justice." Rec. Doc. 207, p. 6. Judge Feldman found that all five factors identified by the Fifth Circuit in justifying the use of an anonymous jury were present in the instant case: 1) the defendants' involvement in organized crime; 2) the defendants' participation in a group with the capacity to harm jurors; 3) the defendants' past attempts to interfere with the judicial process or witnesses; 4) the potential that, if convicted, the defendants will suffer a lengthy incarceration and substantial monetary penalties; and 5) extensive publicity that could enhance the possibility that the jurors' names would become public and expose them to intimidation and harassment. Rec. Doc. 207, pp. 6-7, citing *U.S. v. Krout*, 66 F.3d 1420, 1427 (5th Cir. 1995). Judge Feldman clearly outlined his findings in a 14 page order and determined that all five *Krout* factors in the instant case were present. Judge Feldman noted that the defendants have allegedly evaded prosecution, ordered the death of witnesses from inside jail, conjured perjured testimony and false alibis, and lied to the grand jury. Rec. Doc. 207, p. 10. Judge Feldman also pointed to the alleged numerous violent crimes committed by members of the organization.

Hankton quotes *U.S. v. Delatorre*, 438 F.Supp.2d 892, 903 (N.D. Ill.2006) in support of his claim that the requested information is needed in defense counsels' arguments against the pursuit of the death penalty to both the United States Attorney's Office and the Department of Justice. Yet Hankton fails to quote from portions of the same opinion that recognize that exceptions to discovery are required when "there is a specific showing of risk to potential witnesses." *Id.* at 901. Further, in quoting *U.S. v. Edwards*, 47 F.3d 841, 842-43 (7th Cir. 1995), the *Delatorre* court recognized that "neither the Constitution nor Rule 16 requires pretrial disclosure of prosecution witnesses." *Id*.

Additionally, in arguing for the disclosure of the witness identity and location information, Hankton does not provide a compelling reason that requires the disclosure of names and addresses of witnesses who identified him as part of the pre-authorization and mitigation process. To date, Hankton is in possession of the statements made by these witnesses and can present his argument- that there is a possibility these individuals misidentified Telly Hankton, too- to the United States Attorney's Office, the Capital Case Review Committee or the Attorney General in trying to convince them that the death penalty is not appropriate for Hankton. No explanation beyond the fact that this is a death penalty possible case has been offered to justify subjecting these witnesses to the danger of being identified at this early stage. A closer reading of Hankton's memorandum reveals the true concern being whether the Government "may not call these witnesses at trial." *See* Hankton Memo at p. 8. If Hankton's true concern is that of trial availability, the Government suggests that the District Court's long established rules regarding *Jencks* and *Giglio* disclosures prior to trial are more than adequate to address this concern and can be addressed at a time closer to trial and not as pre-mitigation discovery.

The remainder of the cases cited by Hankton, *U.S. v. Gomez-Olmeda*, 296 F.Supp.2d 71 (D.P.R. 2003); *U.S. v. Diaz*, 2005 WL 1575191 (N.D. Cal. 2005); *U.S. v. Jackson*, 2003 WL 22023972 (S.D.N.Y. 2003) and *U.S. v. Smallwood*, 2009 WL 1734139 (W.D. Ky. 2009) each address discovery issues in death penalty cases prior to the government submitting the matter of seeking the death penalty to the Department of Justice. None of the cases required the government to disclose the identity of witnesses at the early stage of preparing for submissions concerning seeking the death penalty. While *Jackson* required the disclosure of 911 calls and *Smallwood* required the disclosure of statements of known witnesses and others that may be favorable, neither decision contemplated disclosures that required the identifying of witnesses in the manner Hankton seeks. The Government reiterates that Hankton has been provided the substance of the statements made by the witnesses he seeks, just not the name and location information concerning the witnesses. Further, as represented in its letter to counsel for Hankton, the Government is not aware of any misidentifications of Hankton in relation to the murder of Jesse Reed. In providing the substance of the statements related to the misidentifications of Edward Allen, the Government submits that it has fulfilled its *Brady* obligation regarding this aspect of the Superseding Indictment.

**<u>Government Privilege Concerns</u>**

Federal Rule of Criminal Procedure 16(a)(2) states:

> Except as Rule 16(a)(1) provides otherwise, this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case. Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500.

This rule has consistently been cited in decisions denying defense requests for disclosure of privileged, governmental information and documentation. The Fifth Circuit in *In re U.S.*, 397 F.3d 274 (5th Cir. 2005), reversed a district court order in a federal death penalty case where the district court sanctioned the government for refusing to produce work product, attorney-client and deliberative process privileged materials related to the "government's capital charging practices." *Id*. at 285. In reversing the district court, the court of appeals recognized that turning over documentation related to the practices of the government would require the disclosure of documents "which could engender various privilege claims." *Id*. at 285-86. In *U.S. v. Fernandez*, 231 F.3d 1240, 1247 (9th Cir. 2000), the court concluded that the Department of Justice's death penalty evaluation form as well as the prosecution memorandum, two of the items included in Hankton's request, "are not subject to discovery because they are protected by the deliberative process and work product privileges."[6]

In *U.S. v. Mann*, 61 F.3d 326, 331 (5th Cir. 1995), the court of appeals, in evaluating Federal Rule of Criminal Procedure 16(a)(2), stated that "an internal document produced by government agents in connection with the investigation of this case, the reports at issue clearly fall within the ambit of this rule, and thus are exempted from discovery." Additionally, the court in *Mann* noted "that the phrase 'reports, memoranda, or other government documents made by an attorney for the government' was meant to incorporate the 'work product' language of *Hickman v. Taylor*, 329 U.S. 495 (1947), into the rule to ensure that government attorneys' litigation preparations are protected from discovery. *Id*. The court in *Delatorre*, cited by Hankton, went further and recognized the existence of "the work product privilege may apply to discussions between prosecutors

---

[6] See also *U.S. v. Perez*, 222 F.Supp.2d 164, 172 (D.C. Conn. 2002), denying defense requests to discover materials that government prepared and considered in making its decision to seek death penalty.

and investigating agents, and the deliberative process privilege covers memoranda and discussions within the Executive Branch leading up to the formulation of an official position." position." *Id*. at 902. *See* also *U.S. v. Williams*, 998 F.2d 258, 269 (5th Cir. 1993), which held that "FBI Forms 302s were not discoverable statements under the Jencks Act."

Hankton's requests with regard to the Darnell Stewart homicide essentially seek two batches of materials: first, "all correspondence, memoranda, emails, notes and other evidence of communications between the U.S. Attorney's Office" and the "Department of Justice," "the appropriate Assistant Attorney General," and the "District Attorney's Office for Orleans Parish" related to seeking permission and receiving approval to charge Hankton with first degree murder after a conviction for second degree murder in a state case, and discussions regarding whether to prosecute Hankton in state or federal court; and second, "all correspondence, memoranda, 302s, emails, notes and other evidence of communications between FBI agents and state law enforcement officials" regarding Hankton's involvement in the Stewart homicide and 302s of specific agents regarding the Stewart homicide.

Each of these categories of documents requested by Hankton are the same type of deliberative process privilege and work product privilege documents the Fifth Circuit Court of Appeals evaluated in its decisions in *Fernandez* and *Mann* discussed above. In support of his demand for production, Hankton offers little more than a speculative, vague argument that there must be some sort of due process deficiency since Hankton has been convicted of Stewart's murder in state court. No cases are cited to support his demand for the production of obviously privileged documents. As represented in its June 17th letter, the Government acknowledged that Petite Policy approval was obtained prior to charging Hankton with Stewart's murder. Further, Hankton attempts to compare apples to oranges by arguing his federal first degree murder charge

15

oversteps some self-described due process boundary when he was convicted of second degree murder in state court. Second degree murder in state court requires the proof of a specific intent to kill. *See* La. R.S. 14:30.1. First degree murder as defined by Title 18, United States Code, Section 1111, requires comparable intent elements such as "malice aforethought," "deliberation" or "premeditation." Second degree murder as defined in section 1111 does not require similar intent requirements.

It is also worth noting that despite Hankton voicing a concern that certain witnesses may not be called at *trial*, his motion is one for pre-authorization discovery. To the extent he seeks any document for that purpose in order to prepare a submission to the United States Attorney for this district or members of the Department of Justice, including the Attorney General, regarding the death penalty, any of those individuals can access the privileged documents Hankton seeks. It is not necessary for the Court to grant Hankton a thus far unsupported, fishing expedition through internal, government-privileged, documents when Hankton's purpose in seeking access to the documents is to convince members of the Department of Justice not to seek the death penalty. If Hankton believes a due process violation may have occurred and review of the documents he seeks could reveal such a violation, he can simply urge the applicable reviewing official within the Department of Justice to review the privileged documents themselves. It is not necessary for the Court to grant Hankton unprecedented access to privileged documents based on nothing more than his speculative hunch for his stated purpose to convince the Department of Justice to not seek the death penalty, when those very same officials can review any and all privileged documents as a part of their review in making a recommendation or decision regarding the death penalty.

**WHEREFORE,** for the reasons set forth herein, the Government urges this Court to deny Hankton's request for the information and documentation requested in his motion for pre-authorization discovery.

>Respectfully submitted,
>
>DANA J. BOENTE
>UNITED STATES ATTORNEY
>
>S/William J. Quinlan, Jr.
>WILLIAM J. QUINLAN, JR. #22600
>ELIZABETH PRIVITERA #27042
>Assistant United States Attorneys
>650 Poydras Street, Suite 1600
>New Orleans, Louisiana 70130
>Telephone: (504) 680-3028

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2013, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all defense counsel of record.

>s/William J. Quinlan, Jr.
>WILLIAM J. QUINLAN, JR.
>Assistant United States Attorney